Good morning. May it please the Court. I'm Jeffrey Early for the Plaintiff and Appellant Martha Garcia. This appeal raises a single issue of statutory construction. Whether California Health and Safety Code Section 1367.18 requires a health plan to cover any medically necessary prosthetic device that's been prescribed for a plan member by her physician. Let me give you a hypothetical. Okay. Let's suppose that the general rule is, as you say, if it's prescribed by a physician, the plan must cover it. And let's say that a plan covers medical care for the eyes, but the plan has a specific exclusion. It says this plan does not cover LASIK. That's a procedure that is commercially available for improvement of vision. Would you say that if a doctor wrote a prescription for a patient and said to him, Marley, I think this is the best thing for your eyes, this is what you should do, it's the only thing you should do, you should get LASIK, and he gave the patient a written prescription for LASIK, are you saying that the plan would have to cover that because of its obligation to cover what a physician prescribes, even though the plan has an exclusion in the plan language excluding coverage for LASIK? Judge Kleinfeld, no, I wouldn't think that the plan would have to cover LASIK under Section 1367.18 because LASIK is a surgical procedure and it's not a prosthetic device. I mean, we're really limiting the scope of the mandatory coverage here to prosthetic devices that have been prescribed by a physician. And then the statute says that the coverage requires that the statute hypothetically covered surgical procedures as well as prosthetic devices. Then you would say that it would have to cover LASIK. If the statute covered whatever class of procedures we're talking about in your hypothetical, and it said that the coverage had to be as prescribed by a physician subject to medical necessity, if the plan could not establish that that procedure was not medically necessary for that plan member, then under your hypothetical statute there would be coverage. I thought a plan could exclude something even though it was both prescribed and medically necessary. Well, I thought that was what that Yeager decision from the California Court of Appeal meant. Well, no, Your Honor. I think Yeager deals with a specific type of statute under Section. I know the statute is different there. That's why I gave my hypo because my hypo would, it struck me actually as easier than Yeager. Well, let me back up one step. Easier for the plaintiff than Yeager. In California there is a universe of medical care that healthcare service plans, a package of basic benefits that the Health and Safety Code requires that must be covered. And so to be a healthcare service plan you have to cover those things. Then the legislature has specified that healthcare service plans also, regardless of the basic benefit package, must offer certain other coverages. So this is a mandate to offer? This statute is a mandate to offer. Well, it's a hybrid, Your Honor. It's a mandate to offer in the sense that the purchasers don't have to take the prosthetics coverage. They can say, no, we're not interested. So every mandate to offer? Yes. But the difference is, so I guess I should have just said yes. Yes. I think you said it's a mandate to offer. It is a mandate to offer. The problem there is the undeterred. The question is what did she buy? They offered something. What did she buy? Right. What's the scope of that? So when you go to terms and conditions, and this is why Yeager doesn't help me at all, because the question is what can they put in the terms and conditions? And what happens? Where's the limit? If a term or condition, in this case a policy exclusion, guts a legislative mandate, is that permitted? No. Do we have any case law that tells us where we draw the line? Because we know some terms or conditions, that's what Yeager tells us. Some terms and conditions are okay. It's just that Yeager only goes to cost, so that's why it doesn't help me with scope of coverage. The scope of coverage is, I think, is clearly defined in this mandate in two ways. The scope of coverage first is that it has to be as prescribed by the physician, not if prescribed, but as. It has to be the way the physician prescribes it. That's the 1991 amendment. Yes. Okay. What it said in 1985. No, that's not what it said in 1985. The brief says that in 1985 they could have done whatever they wanted. Yes. Yes. They could have. And then in 1991, so in 1985 the legislature, the statutes like the statute in Yeager with fertility treatment, and it simply says you have to offer some kind of coverage. So your brief tells me that you think there's no limit to terms and conditions, to that phrase, because you think, because it was there in 1985, and your brief tells me that in 1985 they could have done whatever they wanted. So there would be no limit to terms and conditions if there wasn't subsequent changes to the statute that limited it. Yes, counsel. So is the answer to my question yes, that as of 1985 they could have done this? Yes. Okay. So you're only focused on the 1991 amendments? I think you have to take 2006 into account as well. But yes, the mandate was added in 91, and I think the mandate is what I'm focusing on. It's augmented by what happened in 2006. My view is that in 1991 the legislature qualifies the mandate and says whatever it is, whatever terms and conditions you agree to are subject to a very specific mandate that we put in. You have to pay for original replacement devices as prescribed by a physician. They have to be medically necessary. So now you have a mandate that the terms within that mandate are no longer subject to negotiation. That I have trouble with. As you read this, the language as prescribed by a physician means that the physician has a golden ticket. If he prescribes it, it's allowable. If he sells the stuff and if he sells it for ten times, actually it's more often hospitals that do this than physicians, but a hospital-employed physician can prescribe something that costs ten times what you can get it for on the net, the same thing, and it's covered because it was prescribed. And it looks to me like you're omitting these words that are in the same statute under the terms and conditions that may be agreed upon between the group subscriber and the plan. And that looks like the way the legislature allows plans to limit what can be covered. So you've got two conditions precedent there. It has to be within the terms agreed upon and it has to be prescribed by a physician. The thing that isn't limited is they can't say you only get it once. You get a replacement. I disagree, Your Honor. Well, how do we ignore that language under the terms and conditions that may be agreed upon? Your Honor, you don't have to ignore the language at all. What you have to do is you have to construe that language in light of the subsequent language in the statute that was added. So you start off with saying that this coverage is unfettered discretion, terms and conditions, no restrictions. In 1991, the legislature says you still have to negotiate. It's still a mandate to offer. But then they say, but any coverage has to meet certain conditions. So now you have something that's non-negotiable. And the question is what is that thing that's non-negotiable? Well, Non-negotiable, you mean whatever it is you offer, the scope has to be that's what's non-negotiable? Right. The scope of the mandate, whatever it is that is going to be purchased, any coverage for prosthetic devices, that coverage has to cover original devices, it has to cover replacement devices, it has to cover them as prescribed by a physician. And if we stop there, which is how the bill was originally proposed, then you'd have the problem of the golden ticket. There are some surgeries where hospitals will typically require the doctor at the hospital will require you to use crutches and then a cane and maybe a grabber after the surgery for a period of time. And they sell them to you at the hospital for many times what they're available for at a medical supply house, any medical supply house in town. Sure. Now, I think under your interpretation, if the doctor prescribed it, the insurance company could not limit the crutches and the cane and the grabber by price. No. Would that come in in the utilization review? Absolutely. So they could say you need the crutch and the cane and the grabber, but in terms of this is basically a cost-benefit analysis. You don't have to pay $5,000. We've got one over here for you for $1,000. The definition in Pacific Care's plan of medical necessity. An answer to the question, yes? Yes. The definition of medical necessity includes within it that the device not be the most, you know, more expensive than something that's similarly effective. It has to not be experimental. Medical necessity has certain restrictions built in. Clans have the right to say that's not medically necessary. And the statute doesn't dictate who the supplier is. But the crutches and the cane and the grabber are medically necessary in my hypothetical. Yes. It's only the price, basically the rip-off from the hospital price that's at issue here, and that's where the plan in the hypothetical wants to draw the line. It seems to me I don't understand why your answer doesn't relate to the fact that they can prescribe the devices. But they can also tell you, I mean, when I take my car in for insurance, they don't tell me how much I can spend. They tell me to go to a car place, and then they approve whether that's the right price. That's exactly right. And it's not medically necessary that you get those devices at the hospital. It's medically necessary that you get them somewhere. The only question is whether the plan can simply exclude them categorically, not where you have to supply them. They're not saying that. They're saying we can't exclude them categorically. They're not saying that we can't exclude them. They're saying we can't be compelled to have you buy them at that hospital. Right. But we can be compelled to insure such a device. If your physician prescribes it, right? And it's medically necessary. In other words, if the mechanic says he needs a new carburetor, the insurance company can't say you don't need a new carburetor, but they can dictate how much he pays for the carburetor. Right. So the terms and conditions say if you're a Kaiser insured. Why can't they tell you medically? Your doctor may correctly say you need one of those rubber replacement disks that they sell in Germany now, and I think they do surgery and put them in in Germany. I don't think it's FDA approved yet in the United States. But it may be. The doctor prescribes one of these rubber disks, and the plan says as an exclusion for rubber disks. I don't see why they can't exclude some things that are medically necessary just as a matter of making their insurance marketable, and then the companies buying the insurance and unions buying the insurance can decide we want cheaper or more expensive, better coverage insurance. I'm going to answer your question two ways. One is medical necessity would say that even the definition of medical necessity is that if it's out of plan or if you have to go to Germany to get it, the plan doesn't have to cover it. So that's baked into the definition of medical necessity. And second of all, once the condition is met and this mandatory coverage is there, it's just like any other mandatory coverage. The insurer can't say, you know, we could offer you a cheaper policy if it excluded care for the... You're reading the mandatory coverage to mean anything a doctor prescribes. That is medically necessary and is for a prosthetic device. And the reason I read that is because the statute says that the coverage that has to be offered shall include, any coverage shall include original replacement devices as prescribed by a physician. And when... Go ahead. When that was first proposed, the legislative history shows that the... Well, wait a minute. Before you get to legislative history, is it your contention that this statute is ambiguous? No. So what do you do in talking about legislative history? Just because it makes it clear and because Pacific Air and the district court don't agree with how to interpret it, so maybe... But it's really important to be clear in your argument. Your first... The first point in the decision tree is you don't think we look at legislative history, right? I don't think you need to. Okay. But if we find it's ambiguous and then we do, you were saying? I was saying that when the provision was first proposed without a medical necessity, the concern that was raised by private health insurers and by departments within the state of California was, well, wait a minute. You can't just put us at the mercy of whatever a doctor prescribes. And so then the statute was amended to address that. If we look at legislative history, Kelso, then we have to look at the letter written by Dr. I think, well, Legislator Filante, who's also an M.D., who made it arguably made it clear that what they were trying to fix with the 1991 amendment is the problem that Judge Kleinfeld mentioned. That is, some insurance companies weren't allowing replacement devices, which was completely impractical because these things apparently wear out rapidly. Yes. All right. So if we look to legislative history, that letter's a problem, isn't it? I don't think it's a problem, Your Honor. Why not? I think that the fact that the legislature had a particular concern doesn't mean that was the only thing they were concerned about. I think that there's plenty of evidence in the legislative history that shows that what they were trying to ultimately do was to make sure that plans could not force the consumers, the people who need prosthetic devices, to have to bear that cost themselves. I thought your answer was going to be that the 1991 amendment doesn't just talk about replacement devices. It says original and replacement devices. What's that word for? What's original in there for if they're only trying to fix the replacement problem? That's right. The legislature, they were concerned about the particular problem, but they went further when they added a mandate and created a mandate that said original replacement devices, which is the entire universe of prosthetic devices. It would be a humongous amendment. It would be a big amendment, a big change from 1985, if I read your argument. Because in 1985, your position is they could have done the insurance company, could have done whatever they wanted, but through the phrase terms and conditions. Yes. And they could have excluded lots of things. In fact, I'm extremely concerned about that because I see no limit to that. But then in 1991, it seems to me that you're hanging your hat on this word original. I am. I think it's important. One of the points that I wanted, before I sat down today, I wanted to talk about the terms and conditions, make sure I make this point. A good example would be the Kaiser plan. Everything you get through Kaiser has to be through the Kaiser program, Kaiser physicians, Kaiser suppliers. The terms and conditions means that if you're in a Kaiser program, then you can't just show up one day with a prescription from some non-Kaiser doctor and come to Kaiser, if you're in a Kaiser plan, and say, well, I have a doctor here who says this is medically necessary. You have to pay for it. Instead, the terms and conditions of your plan dictate that you have to go through the Kaiser procedure to get your prescription, to have the prescription filled. So the terms and conditions language does work. It requires. This is not responding to my concern about that language. Let me tell you what it is. In the orthotic and prosthetic devices, they say coverage prescribed by a physician under the terms and conditions that may be agreed upon. In the fertility treatments, they have almost identical language terms and conditions agreed upon. On the other hand, for mental illnesses, they just say shall provide coverage for diagnosis and medically necessary treatment of severe mental illnesses. Under the same terms and conditions applied to other medical conditions, they don't have this under terms and conditions that may be agreed upon. Likewise, for I think it was inhalers and pain treatment for the terminally ill, they don't subject that to agreement. The fertility treatments and the prosthetic devices, they do. The mental health treatment, for example, they don't. So if the plan says we're not going to pay for hospitalization for anorexics, and most doctors will say you've got to hospitalize them, it has the highest death rate of any mental illness. And the legislature says do what the doctor says. But on the fertility treatments and the orthotic devices, they have this phrase that they didn't put in the mental health or the pain management statutes. So why isn't it the better reading of that to mean that those are subject to plan exclusions? Because the Mental Health Parity Act is not a mandate to offer statute. It's a mandate to cover statute. It's not negotiable. You can't not take it. It's like diabetes treatment. It's not negotiable. It just comes with the insurance. The mandated prosthetics care started its life as a pure, unfettered discretionary mandate to offer, and it didn't have any specifications. Then by accretion. There was no mandate. Right. It started its life without a mandate. Right. It's like the fertility treatment in Jaeger. And then in 85, they said you have to offer it. They said that, no, they already said you had to offer it. I'm sorry. Yes. In 85, they said you have to offer it. Yes. Okay. Go on. Then in 91, the legislature was dissatisfied with the result of that, and they said whatever it is that you still can negotiate in terms of conditions, but there's part of it. There's a mandate now. If it's taken, the coverage shall cover certain things, the original replacement devices, as prescribed by a physician, if medically necessary. If somebody buys it, the scope has to include, this is your theory. Right. If somebody buys it, the scope has to include, you think, a prosthetic device that a physician prescribes. As prescribed and as medically necessary. So you think then the terms and conditions, an exclusion in the policy, that within the terms and conditions can no longer exclude what the physician prescribes. Yes. As of 1991. Yes, if it's medically necessary. The legislature, the utilization control, was the means to allow plans not to pay for what they didn't think was too expensive or was not a proper. And then the story continues. After 91, the plans say, okay, we cover it, but they redefine the word cover, so to mean we'll cover a small fraction. And in 2006, the legislature finds that unsatisfactory. They don't redefine the word cover. They redefine the word it. Right. It's the scope of what they're covering. The scope of the coverage, counsel. This is a really important point, and you keep conflating it, so I'm having a hard time with it. Well, I apologize. The way I view it, maybe I'm mistaken, is that after 91, the plans say, we cover prosthetics as prescribed by your doctor. We just cover 12% of the cost of it. And so then the legislature in 2006 said, no, you can't call that coverage. Now the scope of coverage and the scope of your obligation to pay become congruent. But you can't have special riders, special deductibles, or co-pays that make prosthetics coverage less advantageous than the bulk of the coverage that you're selling in your plan. If your plan says that it has a $500 deductible and it pays 80%, then that's the terms that apply to prosthetics coverage. That's the 2006 amendment. So in 91, the legislature puts in a mandate. So plans still have the right to negotiate some terms and conditions, the costs, something, whether you have to do it in plan or out of plan, all of the sort of things that health insurance covers. But the one thing they can no longer negotiate after 91, the thing that's put off limits from agreement of terms and conditions, is the scope of the mandate. The prosthetics coverage has to be original replacement devices as prescribed by a physician. And the only limitation on that mandate is medical necessity. And our position is if Pacific Care could say that myoelectric devices weren't medically necessary for my client, it wouldn't have to pay for them. But it's not allowed to just categorically say, regardless if it's medically necessary and regardless if your doctor prescribes it for you, we just don't cover that kind of thing. That's our position. May it please the Court, Ethan Shulman for the appellee, Pacific Care. I think the Court's discussion with counsel has appropriately focused us on where we need to go, and that is in the first instance to the plain language of the statute, and specifically the plain language of the 1991 amendments. So where we start, of course, is 1985, the enactment of the statute. And counsel has quite candidly conceded in response to Judge Christen's question. At that point, the terms and conditions language left unfettered discretion to plans to negotiate the terms and conditions on which this coverage would be. Is that your position, counsel? We don't see. Could they have offered prosthetic coverage and then had an exclusion that excluded prosthetic coverage? No. I mean, there has to be some reasonableness overlay. Right. Do we have any case law, anything? I'm looking anywhere. It would help me figure out where we draw that line to see what could be swallowed by the terms and conditions. Not that I'm aware of, Your Honor, and certainly nothing was cited in the briefing. I couldn't find it either. So when you say unfettered, well, and in fairness, you were speaking of a concession made by opposing counsel. I am. It sounds like you're willing to be, even really unfettered, we're just not sure how big that could be. Well, it had to be something. They had to offer some modicum of coverage. They could offer it, exclude it in the general form, and if somebody pays extra, put it on in an endorsement. Sure, in a rider. Exactly. But if I buy prosthetic coverage. Right. The question is what am I buying? What's the scope of the coverage? And to what extent could an exclusion really gut the coverage? And there is some point at which the terms and conditions couldn't swallow what it is I'm buying. And my concession in response to your question, Judge Kristen, was the exclusion couldn't entirely swallow the offer. In other words, one couldn't offer a null set. Right. But one could offer, you know, 5%. Right. And so then we get to the point that we're just judges and we don't know, well, I'll speak for myself, much about prosthetic devices. Right. And so for this particular exclusion to exclude this particular type of prosthetic device, you see, I don't have a way of knowing really because I don't think this record shows me, but feel free to correct me if I'm wrong, whether this exclusion is just excluding a Cadillac or whether it's really gutting, you know, sort of the meat and potatoes of a fair description of what encompasses prosthetic devices. All that you have in this record that goes to that question, but it's something that's fairly significant, is contained in a document that counsel relies upon. Okay. It is the report of the California Health Review Board, if I have the name of that entity correct, and Health Benefits Review Program. Where? It's in the excerpts of record, and the particular page I'm talking about is excerpts of record 265. This is a report that was, and we're going a little far afield here, Judge Kristen, but I wanted to answer your question. Thank you. This is a report that was commissioned by the legislature to determine what the effects, economic effects would be of the 2006 amendments that went to the financial terms that we're talking about. 2006 but not in 1991? Correct. Okay. So that's why I say we're going a little far afield. Okay. And there's a discussion in that, because I had the same question. There's a discussion in that report of upper limb prostheses, which is what we're talking about here, and of a scientific study in which different types of prostheses were tested, that is, these myoelectric prostheses, passive prostheses, and body-powered prostheses, different categories. And the conclusion that's summarized in this report that's reported to the legislature much later, in 2006, is that among children and adolescents who were testing these prostheses to perform 22 common activities, such as tying shoelaces or steering a bicycle, they rated body-powered prostheses, the ones that are powered by the muscles in the remaining part of the limb, as more functional than the other two categories, including myoelectric. It's a very indirect question to a practical question, but there's some evidence that the legislature had much later. Fifteen years later. Yeah. So may I back up? Let's focus on 1991, because I think counsel conceded that's really where the question is. So there are two changes that are made by the legislature in 1991. Well, I think, you know, counsel may have conceded that, but this is a construction of a statute that we have to make that's going to apply to everybody. And if counsel, you know, prefers to make that argument because it's the strongest argument, that doesn't mean that we as a court should say the 1985 statute or 90 something, I think it's 85, whatever the statute before that doesn't apply. I think from I don't want to advance an answer at this point, but I think there is a fairly decent argument that when you have to cover orthotic and prosthetic devices, and that's an obligation that's got to be in the offer that to say, well, we'll cover some small part of them would be a violation of the statute. Now, what's some small part and what you are required to cover? Terms and conditions may be if I have to sell a catalog, I have to sell the catalog if I'm required to. What terms and conditions I sell it on is different from whether I have to sell the catalog and whether I have to. So what I have to offer is really done by the statute. But what terms and conditions I have to offer, it could well be argued is a different subject entirely. I don't disagree in the abstract with any of that, Judge Reinhart. My point is only that based at least in what I found in the record in response to Judge Kristen's question, the coverage here was meaningful coverage. It was material coverage. It wasn't an exception that swallowed the rule. And so once we get past that threshold question, I think we need to ask, okay, what does the statutory language that's added in 1991 mean? So there are two phrases. There's the requirement that the plan cover original and replacement devices. And as counsel responded to, and as I think Judge Kristen correctly observed, that was the problem that as Dr. Filanti, the author of the amendment, said, the legislation was intended to fix. Some of the insurers were saying, okay, we'll cover one device, but when it wears out, we're not going to cover a replacement. And that's what that did. Forgive me. Why did they include the word original? In 91, why didn't they just say shall include replacement devices? What's the word original in there for? To distinguish it from replacement devices. And I would turn that around, if I may, and say if what the statute means, and this is really the heart of the issue here, what the statute means is the plans shall cover all medically necessary devices prescribed by a physician. That's counsel's position. Where's the word all? No, no, no. Now you're going to a different argument. I need you to answer on 1991. Right. I think your view of the statute, because I think I understand his view of the statute, but your view of the statute is that in 85, the insurance company had to offer coverage for prosthetic devices subject to terms and conditions. And I think you've been very candid in saying the exclusion couldn't have been, it would have to be a reasonable exclusion. At a minimum, it can't negate the offer entirely. Fair enough. All right. So that's the status quo. And then as of 1991, when they were trying to fix this problem about replacement devices, why didn't they just say replacement devices as opposed to original replacement devices? Because it already covered original. We already talked about original. The statute already addressed that. You know, it's a good question, and I don't have a very good answer for it, except to say that particularly as state practitioners know, the California legislature doesn't always phrase things perfectly. Nor does the Congress of the United States. It's not just California. Fair enough. Or the Ninth Circuit. But here we are, and it just seems to me that we've got this, of course, you know, the statutory maximum. If we're just looking at the face of the statute, that really has to mean something. Right. I think they were simply distinguishing between devices that are originally prescribed and replacements of those devices that are prescribed later. But doesn't this say, in 91, any coverage, meaning you're going to offer it, and subject terms and conditions. So it's going to look a little different. Whatever design buying, the scope of that may look a little different, depending on which insurance company is doing the writing. But any coverage for prosthetic devices shall include original and replacement as prescribed by the physician. That's one reasonable interpretation, right, is that if your doctor prescribes it and I've bought prosthetic coverage, you have to cover it subject to the utilization review. Well, so let me answer your question by slightly shifting to the phrase as prescribed by a physician. Because that, I think, is exactly where my friend's argument hinges. Okay. As prescribed by a physician, why is that added in 1991? Does it mean, as Judge Kleinfeld opened today's discussion by asking, any physician who prescribes any device, that's the golden ticket. The health plan has to cover it. And the answer is no. And here I will go beyond the plain language of the statute into the legislative history. But you don't have to, because there's a utilization review procedure. There is a utilization review procedure, but that goes to whether it's medically necessary. But why did they add the phrase as prescribed by a physician? The legislative history gives us the answer. Because it says the legislature was concerned that other practitioners, and they specifically list chiropractors, were prescribing these devices and they wanted to make it clear, no, a device can only be prescribed by a physician. Later they added surgeons and podiatrists. So that's what that means. It doesn't mean there's a golden ticket every time a physician prescribes something, it's a limitation on coverage. It has to be prescribed by this particular type of medical practitioner. That's what your team thinks. That's what the legislative history says. Well, do you get to the legislative history, counsel, or is this an unambiguous statute? I will agree with counsel on one point. We think it's unambiguous as well. With this you think it's unambiguous. Yeah. Two different ways. Exactly. So do I consider the legislative history that you're telling me about or not? Well, I suppose if you have two parties who both say it's unambiguous but in opposite directions, I suppose perhaps you feel like you have no choice. Do you need it on this point? I mean, if a chiropractor makes a prescription, I know he's not a physician, I know he's not a surgeon, and I know he's not a doctor of podiatric or radiatric medicine. Right. So the insurance company doesn't have to pay for it. Right. Isn't it plain on its face? Do we need legislative history for that? As to that point, I don't think you do. If a chiropractor comes in here suing, where's my money? No. That's easy. I agree with you. Let me insert into this discussion, though, a case that is discussed in our brief and is absolutely neglected in either the opening or the reply brief here because I think it helps us deal with this. It's not the Yeager case. There was some discussion about Yeager before. But it's the Kaiser Foundation versus Zingale case. Very similar issue. Another one of these provisions from the Knox-Keene Act involving the coverage of prescription drugs. And Kaiser, in the case, offers coverage for prescription drugs, but it says we are excluding coverage for drugs necessary to treat sexual dysfunction, Viagra. The Department of Managed Health Care, of course, the administrative agency responsible for administering this statute, says, no, if you're going to offer coverage for prescription drugs, you have to cover all prescription drugs. The same little word, all, that we've been talking about. And the Court of Appeal, the California Court of Appeal in 2002, rejects that position, invalidates the DMHC's regulation, and says, if the legislature had intended to require every health care service plan that offers a prescription drug benefit to cover all medically necessary prescription drugs, or to allow the department to impose that requirement, it would have been simple for the legislature to say so. It's exactly our situation in 1991. If the legislature here had intended to require coverage in 1991 of all medically necessary prosthetic devices, instead of saying original or replacement devices as prescribed by a physician, it would have been very simple for it to say so in express terms. And I'll add one other point, because I think it's particularly pertinent here from Zingale. The Kaiser decision, or Zingale decision, pointed to a particular provision, which says that once a plan offers coverage of prescription drugs for an enrollee, and the enrollee takes the medication and continues to need it, the plan is required to continue offering the same coverage. Why does that help us? That helps us because that's an exact analog to original and replacement devices. In other words, here we've got in 1991 the legislature saying, if you offer coverage for original devices, you have to cover the replacement devices. The court says, I'm sorry, I didn't mean to interrupt. The court says, why is that important? Because if the legislature had intended to mandate coverage of all medically necessary prescription drugs, there would have been no need for them to be very specific in this provision and say, once an enrollee has started taking a drug, you have to keep covering it. They could have just said all, and that's exactly our situation in 1991. But it's not. That reinforces, I think, that by saying replacement, they didn't need to use the word original, but they used the word original. They included the word original. You know, as I say, Judge Kristen, I can't give you a better answer other than to say they were contrasting original devices prescribed and replacement devices necessary after the original devices had worn out, but they were not saying you have to cover all medically necessary devices. They could have said that much more simply. Oh, I get it. You're saying that if what they meant was that if a doctor prescribes it, it's covered, then all you'd need is a doctor's prescription to get your replacement device, and it would be covered. Exactly. And they wouldn't need to provide in the statute a replacement device. Exactly. All would include original and replacement devices by sort of by definition. I understand what you're saying. And I'm sorry it took me so long to get it out coherently. Well, we took you a minute and 40 seconds past your time. So if you have something you feel is important to wind it up, do so. Thank you, Judge Reinhart, and I appreciate the court's patience. Let me add one more point, and it's another point that gets neglected in my friend's briefs, certainly in the opening brief, and that is the position that's been taken by the California Department of Managed Health Care itself. The DMHC took the position not once, not twice, but three different times that this exclusion was consistent with the Knox-Keene Act. It took it in approving the EOCs, the evidence of coverage, that Pacific Care adopted in 2008, where it specifically went to Pacific Care and said, we have some problems with some of the prosthetics coverage language in your EOCs. Change it. But didn't say anything about the exclusion we're talking about here. They approved second time. They approved the EOCs the following year. And then the third time, of course, in this very dispute between these two parties, the appellant went to the DMHC after the denial and said, this isn't right. And the DMHC said, and maybe it's worth quoting, the law does not require health plans to provide myoelectric prostheses, the exact issue that's before the court. We can't even tell if that was a lawyer who made the decision. What difference do we give to that? I admit, Judge Kristen, and I agree with my friend, that that's not formal regulatory guidance. It's not a letter from a lawyer. It's not a regulation. The court gives it some lesser deference. Why? Because it's not formal. But, I mean, what authority says we give it deference? The authority that says you give it deference is the Yamaha case out of the California Supreme Court, and as applied in cases involving the DMHC, that says, look, deference is situational. If an agency has taken a consistent interpretation over time, and that's the case here, a court is more likely to give the agency's view some weight than if, as for example in Harlech, an agency flip-flops and takes one position, and then when it gets into litigation, takes some other position. Thank you. And that makes a lot of sense. Thank you, counsel. Thank you. Thank the court. Counsel, we'll give you a couple of minutes. I appreciate that, Your Honor. I'll try to use it wisely. I want to first go to the issue of how much discretion the 1985 statute gave, and I think that a good analog is the Health and Safety Code section 1374.55, which is the fertility statute in Yaeger. It has no mandate. And the claim in Yaeger is that you provide $2,000 in coverage for fertility treatment, and fertility treatments cost $25,000 or $30,000. That's just not really providing coverage. And the Yaeger court said, look, the legislature hasn't said how much coverage is coverage. It just said something, and we're not in a position to second guess, and $2,000 sounds reasonable. In our case, the legislature didn't leave it at that. We're not just having to rely on an argument like they made in Yaeger, because we have the amendments that make it, in our view, clear that there became a mandate. The second point I want to make is that counsel says when the legislature wants to prescribe mandatory coverage for all prosthetic devices, it knows how to do it. And we agree, and the examples that were given in the Applebee's brief on page 24, there are two examples given, and neither one of them uses the word all. In fact, we like that so well, we put it on page one of our reply in a chart, because it shows that the health and welfare code section, 14132K, the Medi-Cal statute, just says there should be coverage. It doesn't say all coverage. It just says there's coverage. Devices shall be covered. That doesn't mean some devices. And in Harlech, this court said that when the statute in the Mental Health Parity Act says you have to provide medically necessary coverage for severe mental illness, that that doesn't permit some. You don't interpret that as some. You have to subject the terms and conditions language. That is true. But, again, we're interpreting not the terms and conditions. We're interpreting the mandate. So the question is what's within the scope of the mandate? Counsel talks about the explanation for as prescribed by a physician. Just means that just says that it couldn't be a chiropractor. And by making that argument, Pacific Care is changing the word as prescribed to if prescribed. It's changing the requirement that something be done in accordance with, as it does work in this statute. It's a little word that's carrying a heavy burden. As prescribed in accordance with, it's not just a condition proceeding, if prescribed by a physician. And the final point is we address in our reply that the DMHC statements here are not entitled to deference because I don't think it interpreted the statute correctly. And we think that our position is appropriate, and we'd ask you to reverse. Thank you. Thank you, counsel. Thank you very much, both of you, for very good arguments. And the court will stand in recess for the day.
judges: Reinhardt, Kleinfeld, Christen